We have Appeal Number 22-1932, Eolas Technologies Incorporated v. Amazon.com. Mr. Campbell? You've reserved four minutes for rebuttal. Yes, Your Honor. Okay, please begin. Thank you. May it please the Court, John Campbell for Eolas Technologies. This Court should reverse the District Court's holding that the asserted claims of the 507 patent are ineligible for patent protection because the claims are directed to an improved computer network system, a World Wide Web in which the major components have been reconfigured to overcome particular problems and enable interactivity, scalability, and security. Can I ask you just a couple questions about how this claim works? This is about enabling a user to interact with some kind of object, some kind of data object, right? At a very high level, yes. And it's all being done through a web browser. Yes. Can you explain what does it mean to interact with an object, if that's understood by this claim? Yes. So an object is defined, it was construed and it's defined in the patent. It's things such as an audio file or a video file. So interaction could be things like hitting play, pause, fast forward 15 seconds, reverse 15 seconds on an audio or a video file. It's defined to include things like spreadsheets where you can manipulate the data, change the data, recalculate data, things of that nature. Does it encompass interacting with an object encompass something like pinch and zoom? Pinch and zoom, yes, if you're zooming in on an image. That's also. Like when you talk to a computer and the computer talks back to you. Is that interacting with an object in this claim? Well, so first of all, just to be clear. Like Siri or Alexa? Well, I guess we'd have to understand the art. If you're just talking to your computer, maybe not, right? There is more to this claim in terms of the object has to be part on the client, part on the server. OK, the object is displayed on a web page and then you, the user, I guess you're talking to that object and then there's something in the app or the object itself that is able to respond back to you. Yes. Is that encompassed by this claim? Your Honor, that's an excellent question, because as you just pointed out, part of what the claim requires is that the object be displayed in the web browser. So it depends, I guess, on the implementation of whether it's just talking to you and there's no display, perhaps not. I guess one concern I think the district court had is that this claim is saying that you, whatever this invention is, it enables a person to be able to interact with an object, an object that's displayed on a web page. And there's all different kinds of possible ways that you can interact with an object and there's all different kinds of objects that could be interacted with. And yet the claim doesn't explain any of that on what are the implementation details, the nuts and bolts of how any of these different versions of interactions with any of these different objects would occur. And so in that way, maybe this claim starts to look a lot like some of our case law where we said result-oriented claims that don't provide any details on how one would actually accomplish the desired result. Here, interacting with an object has a problem under the abstract idea section. Could you comment on that? Yes, of course, Your Honor. And so I think here we have to recognize two things. One is the configuration here is defining the architecture. And the other thing that we have to consider is this court has pointed out time and time again in its case law is we have to consider the improvement, the focus of the claim to advance over the prior argument. And part of the struggle standing here, sitting here today in 2023 is to remember this patent goes back to 1994, right? And in 1994, the web was just a series of pages with clicks to open up another web page, open up another web page, all static, right? No interactivity whatsoever, right? In the record, we have at 17454 a picture of Microsoft's web page, static, a bunch of hyperlinks. And so what we're talking about here is this claim defines through eight different ways, different than what the prior art was, how to configure an improved network, an improved World Wide Web to enable this interactivity in a scalable and secure way. So you've got eight different ways that's done, I guess nine if you count the combination of the ways in which this network is architected different than the prior. Well, let's stick to the claim. Yes. I'm sorry, Judge Stoltz. I was just going to ask, I thought it was interesting you were talking about how the claim is defining the architecture of the World Wide Web. Is this a method claim or is it a system claim? Because it seems like it's a hybrid. Well, claim 19, or sorry, claim 32 is a method claim. I believe claim 19 is a system claim. It's a method claim. But if I'm looking at claim 13, which is a method claim, it has two steps, step A and step B. And then it has, within step B, a very long functional description of what the architecture is. And so I'm wondering, is this a method claim or is it a system claim? Sorry, claim 32. Claim 32 in particular. I'm sorry, I thought you said 13. So it is a method claim, but it does define the environment in the way this needs to, within what this method has to be performed. And within this environment, you have to have a particular World Wide Web reconfigured network that defines the architecture in a way that is very different from what was done in the prior art. OK. I'll have you go back to Judge Chen's question now that you've answered mine. OK. So when we look at the claim of Judge Chen, as you asked, and there's eight different ways, nine with the combination, that when you consider what the World Wide Web was in 1994, and you consider the way this claim is defining the improved computer network, the World Wide Web, and changing things, we have an architecture that is required here that is not just result-oriented, right? Let me ask you a question on the abstract idea. If you took distributed computing out of the claim altogether, and you just focused on the interactive, interactivity element here, do you think that this claim, these claims, books, and particularly in Claim 32, would survive? I do, Your Honor. What's left after you take the distributed computing out that isn't an abstract idea? Yes, so it's still defining an improved computer network system, right? And so if we go through, it's interesting, there's been a lot of focus on the distributed computing, but that shows up in- Maybe more than there should be, right? That's the last 10 lines of about a 55-line claim, right? So we don't even get there till the end. If we look before that, the claim tells us that we have to relocate part of the object into the web page to display and interact with it in the page, not talking about the distributed application. We have to reconfigure the web server to detect that object, send information that detects the object. We have to reconfigure the web browser with multiple interactive content applications. None of this was done before. All of this is- What is it about putting the interactive applications in the web browser themselves? What was the difficult thing about doing that? I'm trying to understand the difference between having those applications in the web browser versus outside the web browser. I know, for example, that your title of the invention is automatically invoking external applications. Figure 8a talks about launching an external application, and now what's being argued to us is something that's an inventive concept is having these internal applications. So I'm trying to understand. I can't understand from your specification, for example, why that's inventive. Could you help me to understand that? Sure, you are. So in 1994, it wasn't done, right? It was all static hyperlinks. And so to reconfigure the web, to change the browser, and there's source code that is referred to in the specification, included in the specification in Appendix A, where the web browser was changed to bring in an interactive content application that is then invoked from the web browser. That was different than what was done before, than what he had done before. I guess the question is, though, why does that matter? I mean, if the prior art was you had an app separate from the web browser that was handling the display of some perceived data object, and now your plan says, well, I'm going to put that app right into the web browser itself, why does that make a difference? Why should we consider that some kind of technical improvement or something that is any kind of improvement over the prior art version, which was already receiving data objects and then displaying them through some app? We just click on a hyperlink and get a new web page, right? And so I think we've got to be careful not to isolate things. It's the combination, right? Could you answer that question? I mean, I just really want to try to understand. Sorry, if I'm not, I'm trying to. Maybe I don't understand the question. You were talking about we don't isolate things. I want you to just assume for a minute that we can isolate things for a minute and just answer the question about one of the assertions you make is that an inventive aspect of your invention is taking these interactive content applications and having them in the web browser as opposed to outside. Yes. So why is that? Well, for one, it's novel, non-obvious, and it was new in 1994. But what is, as Judge Chen said, why is that a big deal? What advantage or benefit do you get from that? Well, that's where in isolation, I would have to think about that. But in combination, when you start to consider doing that, which has never been done, and then what that then leads you to, right? To be able to put that in there and interact with an object over the web, right? We can take advantage of the power of servers that we couldn't take advantage of before. Go ahead. Okay. I guess that's my question, which is, is there something about the old way of doing it before you put this interactive app on the web browser? Is there something about that old way of doing it that prevented you from being able to tap into the distributed computing of a network of computers? The old way didn't do it. I know it didn't. But I'm trying to understand, is there something technically interesting about taking the app, instead of it being an external app, putting it into the web browser? And therefore, by putting it into the web browser, that permitted something that wasn't available before, which is to say, now, thanks to having the app on the web browser, you are able to tap into a network of computers that are connected to the web. And that is the key to the invention. And so, am I onto something? Or am I misunderstanding the claims invention? Well, I think we're having trouble getting back to 1994. The way this was done in terms of interactive content in 1994, is you had to download the separate application, and then you could use it. And depending on the size and the scale of that, maybe that couldn't even be done. Are you suggesting... The question is, did you show people how to do it? Or did you simply say, this would be a keen thing if we could do it? And here's the keen thing. And therefore, I get ownership of any way that it's later done. To me, that's the key question here. I'm not hearing how your claim language, never mind the specification, but your claim language actually tells us how to do what you are saying was achieved. Okay. So, you go through the claim, right? It architects things with eight, nine, with the combination of different ways to make this happen. Right? We're going to relocate part of the object to be in the web page, displayed in the web page. Well, that's describing an objective. We're going to put the object in the web page. It's not saying how to go about it. Now, you may have had... I will accept that in your specification, there's a way to do that. But, and if you had pleaded this as a 112.6 type function, means plus function claim, you would get the function as affected by the structure that you've claimed in the specification, planned equivalence, but no more. But the way you pleaded it, you get everything that performs this function. That seems to be very broad. And to be at intention with cases such as interval licensing, Amaranth, SAP, and ultimately back to the Halliburton case. With all due respect, I don't think it is functional. It's saying, this is how you change versus what was done in 1994. This is how you change. This is how you architect it. Okay. Put this here, rather than here. Dude, put the interactive content application in the web browser, rather than outside. Have the interactive content application be able to invoke an interactive... But be able to. That is describing function. Well, it... Sorry, I don't even know. When you architect it this way, you are able to do these things. When you architect the web in this way, you are able to have this functionality. Counselor, can I ask you, on step two, when the district court held that the idea of putting the interactive applications in the web browser is itself an abstract idea, right? Said, why is that wrong? Why is that not an abstract idea of itself? Putting interactive content applications in the web browser. On step one or step two? Step two. Step two. If we go to step two, Your Honor, if we assume that the district court's recitation is an abstract idea, then I think these eight different things, nine with the combination, certainly make... There's more to... Can I back up and try my question again? Yes. Why isn't the idea of having interactive content applications in a web browser abstract? Why isn't the idea of moving the application, previously interactive content applications were external to the web browser. Your claim says they're internal to the web browser. Why is that not an abstract idea in and of itself? Because it's defining how to change the network, to change the World Wide Web in a way that wasn't done before. So it's a concrete, specific change that is not just saying, do it on a computer. The computer's not just used as a tool. We're saying, actually change the World Wide Web in a way that allows for these advantages. And so that is not an abstract idea. It's not just saying, apply it on a computer or do... And that's what I've been trying to pull out of you, and I'm going to try it one more time because this matters to me. I'm trying to figure out why, in your view, does the relocation of the app from the client computer to the web browser matter? What do you... What benefit do you get from that? What is the technical-based advantage of that? And that's why I followed up that question with, could it be that by having the app relocated to the web browser, now you're able to somehow more efficiently or automatically tap into the processing power of a network of computers that are also connected to the web? What's the answer to that question? Yes, you can. But I don't think just that by itself allows that. I think there's other things that are required, that are defined by the claim, that allow what Your Honor just said, to tap into these resources that you couldn't tap into before. It's not solely moving... I don't want to isolate things and leave the court with a misimpression that solely I'm trying to find out if there's some technical-based connection between the relocation of the app to the web browser with the distributed computing feature of the claim. Yes, those two things, along with others that are defined by the claim, allow for the scalability of accessing server computers that give you more power on the client than you had before, allow you to have interaction that you didn't have before. And architecture in the way that the claim requires allows for a secure way to do that that didn't exist before 1994. I think your expert report was under seal, or at least partially under seal. And I'm just trying to understand, did your expert speak to this issue? And when I say issue, I mean, in the prior arc, you would not have been able to enjoy the access of processing power of a network of remote computers. But now this invention, as drafted in the claim, allows you to do that, something that you couldn't do before, because we are doing it through the web and we have an app that is embedded in the web browser. Yes, John, our expert did speak to it. There's several reports and declarations. If the record at 17453 to 56, there's an expert report discussing the state of the art, the need for helper applications, how this changed the art. There's a declaration at 12024 that talked about the web not adopting this mechanism until 1996, so three years after it was invented here. There's another report at 12216 to 18, talking about early web authors' resistance to even consider something like this, and that the later Mosaic authors expressed admiration for the inventors for doing this. So there are a number of reports and declarations in the record from our expert speaking to this as an advance over the prior arc. I think we've gone on long enough and we need to hear from the other side, but we will reserve at least some time for rebuttal for you, okay? It will depend on how long we go with Mr. Bell. Understood. Thank you, Your Honor. Thank you. Let's give Mr. Bell 19 minutes, if needed. Thank you, Your Honor. May it please the Court. Gabe Bell for the appellees. I think what we've heard here thus far really highlights the problem, and that's the sweeping nature of the asserted scope of these claims. According to Iolas, anything interactive on the web today falls within the claims that this comes under their ownership. And the problem with that, I think as the questions have elicited here, is there's no nuts and bolts, as Your Honor was talking about earlier. There's no, how do you do something technologically interesting here that wasn't done before? And the thing that really, as I read their reply brief in particular, that they're kind of resting on, in large part, is this notion of doing it in the web, right? Their reply, it's a page, the last of their reply, that's what got them over the obviousness hump, that obviousness type double patenting. That's the only thing really different about these claims compared to the ones that were invalid before. So it's understandable that that's what they would focus on. The problem is, that creates a problem for Section 101, because all this claim does is say, do it on the web. And Your Honor asked the question about, is the application actually in the browser? The answer is no, for the reasons that you described. In the title, it's an external application that's being launched. In column 15, an example is an external application, figure 8A, external application. All you're doing is providing the output of that, rather than in a separate window, under the, you know, whatever window system you're on, you're providing the output and the interaction in a browser window. And so it really does come down to, do this thing, do interactivity on the web. And that's a problem under cases going back to right after Alice. If you think about the IB versus Capital One decision in 2015. I guess the concern I have, or one concern I have, I have a lot of concerns on both sides, is the district court's articulation of the abstract idea here, which I believe the claims were directed to. The court said, the abstract idea is enabling interactivity with remote objects on a client computer browser using distributed computing. And one argument could be that the district court went too far in shoveling in elements of the claim into the articulated abstract idea to such a degree that there was nothing left to rely on as to what could arguably be an inventive concept here. And maybe the abstract idea should have really been left at the broader notion of enabling interactivity with remote objects. And then the debate is, okay, what about relocating the interactive app from the client's own computer to the web browser? And then is there something about that that allows you to tap into a host of remote computers and its processing power in order to overcome a given client computer's limited processing power? And then also, at least at that time, limited bandwidth that was available on the internet. So could you speak to that about my concern about what is the right way to frame the abstract idea here? So a couple of thoughts on that, Your Honor. One, I don't think it matters, and I'll explain why. But two, even at that level of granularity, there are cases such as Simio, such as AppTech Mobile, that have a similar level of explaining what's included within it. And I think there was a good reason for that. Because where you have functional limitations that aren't telling you how, it makes sense you kind of have to describe everything that's going on. So I think that's fine under this court's case law. But backing up to the first question, I think it wouldn't matter whether you stopped after enabling interactivity. And then, as Your Honor said, doing it on the web, does that provide something more? And you'd also have to look at doing it with distributed computing. Does that provide something more? I think that would have been a fine articulation as well. Because, and I think this is key, in the patent specification, at columns five through seven, it really lays out what the problem that the patentee at the time said they were overcoming. And the problem is that lack of client computing power, that lack of internet bandwidth. And it says, how are we going to overcome that? Not by improving the internet. Not by improving the client computer, per se. But simply by harnessing the existing power of distributed processing. That's at the bottom. But does harnessing the existing power of other computers constitute at least some form of something that would fall within step two of ALPS, a step that may or may not be well recognized and retained. But if it's not, wouldn't that be something that would rescue the claim, if we view the abstract idea as not including distributed computing? I don't think so, Your Honor. And here's why. Because the patent doesn't talk about the distribution in any meaningful way as providing some technological advances, harnessing it. The claims don't explain how to do any sort of load balancing. And I think there's a key passage. Would that make it patent eligible in your view? My guess is the answer would be no. If the claim had an extra limitation that said, well, we're going to divvy up the processing needs amongst the different remote computers such that the client computer is only doing a limited amount of processing. I mean, that, I'm sure, would not persuade you that that is good enough either. So I'm not sure what that means in terms of being a useful argument for us to think through what makes the grave as an inventive concept. Well, I think particularly on this record, and I'll just bring it back to this record. And this is an admission by the inventor. And this is at page 16, 659 and 60 of the appendix. And the inventor was asked, point blank, is there anything in the claims that tells you how to do this distribution? He says, no, nothing in the claims. He said, we didn't invent that. So there's nothing in the claims. And there's admission that they didn't invent distributed computing as they had to. They were just using it and tacking it on as a technological environment in the same way that in Alice, if you tack on a computer to do certain things, even if it was new, that doesn't make it patent eligible. The tricky thing about the how inquiry, the claim doesn't tell you how to do x. It doesn't tell you how to do y. I mean, we could play that game all the way down to the deepest level of granularity. I mean, Bascom, for example, didn't tell you how to install that filter on the remote server or how to make the different choices of the given whiteness or blackness in terms of accessing internet websites. And this court said, that's fine. It doesn't need to go that level of teaching how to do all those different features. All that mattered and was good enough was the relocation of the customized filter from the individual client computers to the server. And then through that, there was this technical advantage of being able to use the server's individual client addresses in order to permit and serve customized internet filters. So here we have a situation where we are doing something maybe similar to Bascom. We are relocating this kind of app from the client computer to the web browser. We are relocating some of the processing from the client computer to a remote set of computers. And maybe through all of that, now that kind of invention can give you something that could never be gotten before, which is interacting with highly complex data objects. So I think there's a crucial difference here between Bascom and the current case. So Bascom was at the Rule 12b6 stage. And this court credited all plausible inferences in favor of the patent team. Claim construction hadn't happened. Here we're on a very different record. Years and years later, after EOS insisted on and secured very, very broad constructions over the defendant's objections, I would note, for any sort of details from the spec or otherwise that might confine this, confine what it means to be interactive, confine what it means to be distributed, confine what it means to invoke an application. And so the court construed it at the time. And so we're left with really vacuous limitations. And Your Honor is correct. It's sometimes hard to see how much how is necessary. But I think on this record, where you have the patentee, in its own words, attempting to own the interactive web as we know it. I mean, just taking a step back, when you look at the sheer breadth of that, I would submit it subsumes almost any other patent this court has ever examined under Section 101. And that is a key indication that there's something wrong here. That's not the way the patent system's supposed to operate. Can I ask you, going back to step two, so you had mentioned that it was your view of, for example, Claim 32, that the interactive content applications didn't actually have to be in the web browser. I think you were suggesting that. Is that based on claim construction? Is it based on what is your basis for that? Let me tell you the part of the language of Claim 32 I was thinking about. It says under Part B.I., it says a worldwide web browser has been configured with a plurality of different interactive content applications. So I think that's the key language. But what is your view on what language or claim structure you're relying on to say that these interactive content applications don't have to be within the web browser? Right. So I think, again, the title of the patent is to start with. But then the claim construction said that the web browser is separate from the application. It also said there does not have to be a predetermined set of applications. And if you look at the example given in Figure 10, for example, their so-called VIZ application, they say practices the invention. That is separate from the browser. So the processing that's going on in the application, the interactive application, is in fact separate from the browser. And I don't think they'll tell otherwise. It's just the output of that and the interaction of that goes through the web browser. But that's the same type of confining to a technological environment of the web that was at issue in Ultramersh. For example, you had interactive content. The user had to click on an ad to see some content. And doing it on the web, use the word web or web pages, wasn't sufficient, even if it hadn't been done before. Do you have an appendix site for the claim construction aspect of your answer? I do. I will find that for you. It was in construing the interactive content application. And I'll make sure to get that for you. And I don't think my friends on the other side would say otherwise, given all of this intrinsic and other evidence. Let me return to the question that we've talked about a bit on a couple of occasions here. Suppose that we do not agree with your characterization of the abstract idea. And we either construe the abstract idea, let's say, just by hypothesis, to be enabling interactivity with remote objects full stop, or enabling interactivity with remote objects on a client computer browser. Full stop. What is the proper way we should go about disposing of this case? And analytically, what would be the path that we would follow? So in all events, I think they're ineligible as a matter of law. So the proper path at the end of the day, I think, is to affirm. I don't think it matters. This court sometimes does tweak the abstract ideas that they see when it comes up on appeal from the district court. And recognizing that there really isn't a difference between different ways of formulating it, I think, ultramarginally. That's a key question. Is there a difference that makes a difference to the outcome of this case? It absolutely does not. And I'll take each of those kind of curtailing that Your Honor suggested one by one, if I may. So enabling interactivity with remote objects, I think even my friends don't meaningfully dispute that that's probably an abstract idea. We certainly think it is. The next part of that is on a client computer browser. So that's the limitation in some fashion to doing it on the web, right? Provided in a browser, just like an ultramarginal, just like in Capital One. So that wouldn't provide an eligible spark. And then finally, using distributed computing. That's the final piece. And that one, to bring the court, if I could, back to the specification. That's really the piece of this that the specification calls out, including at the bottom of column six, as being what these patentees are doing. And that is harnessing that power of distributed computing. But on this record, where A, you have a construction of distributed application that is vacuous. It just means doing an application that's distributed, number one. Number two, you have the patentee's own inventor saying they didn't invent distributed computing. Right, but doesn't that go to step two rather than to step one? Aren't you really saying, well, they didn't invent it. It was conventional, well understood and recognized. Oh, is that what you, the way you would tell us that we should analyze this case, if we disagree with you and the district court with respect to the abstract idea? Absolutely, Your Honor. So having defined the abstract idea as you suggested, then these other additions, you would look at, well, we would look at step one to ensure that they don't somehow change the abstract idea. Right. And we don't think they do. But then at step two, you would ask, does it add something inventive? Right. That's ultimately a question of law that might have underlying factors, but does not here for the following reason. And here's why. First, it's admitted that using distributed computing is conventional, that they didn't invent that. They disavow any notion that that's what they invented. Right. That's a 1665960. So in those circumstances, this court has said it's perfectly appropriate to acknowledge that, whether it comes from the specification or from an admission by the patentee itself. So that wouldn't provide anything at step two. Likewise, on a client computer browser and everything that goes with is simply confining it to the internet context. And that at step two is what this court looked at in Ultramershal and Capital One as not providing an inventive idea, even if, even if, and I think this is crucial, even assuming that it was new. So I was just going to ask you, like setting this case, you know, setting your advocacy in this particular case aside and looking at the case from our point of view and thinking about how we should analyze it, all these cases going forward. There is something interesting about the fact that this was, going back to what was it? It's a very old invention, right? Right. Was it? 1984 is the date. So there's something attractive about having the step two analysis in there, because at least you can take into account what a person in ordinary skill in the art would have thought with respect to inventive concept, which brings the timeframe in there. I mean, do you have a response on that? I mean, because if everything is just bucketed into step one, you don't even get to think about the timeframe of the invention. That seems wrong to me. I do think the timeframe does play a role taking a step back. I don't think it ultimately matters here because of the admissions, because the specification itself doesn't treat distributed computing as anything unconventional or new, because the claims don't explain, for example, how to distribute that load between different things. For any of those reasons, I think the timeframe is irrelevant here. It would be the same then as it is now. Now, of course, again, taking a step back, we now have a very different framework from the Supreme Court than when these claims were ultimately first prosecuted through all initial continuations were all pre-ALICE. This one ended up right after ALICE. So you have a specification that's candidly written for a different time, right? It was at a time when you could just tack on things like the web. You could just tack on things like distributed computing, and it would have been eligible. That's no longer the case now, and I think for good reason. And again, looking at the broad, broad scope, and I would point the court to a statement at A15547. This is where their inventor is saying there are, quote, limitless number of ways, end quote, to implement this. And that's consistent with the lack of any sort of restriction on what constitutes interactivity. How do you balance the load? How do you do all these other things that the claim, to be fair, is verbose? And there's a lot of jargon, but looking at this court's case law, and as the panel steps back and tries to figure out where it fits in the matrix of the case law, I think a couple of decisions really stand out. One is the Affinity Labs case, and that's actually a pair of cases, where it was about providing interactive content in a mobile device that was, quote, configured to provide a list of options for the user. The user could select it, could receive some streaming content, or receive some internet content. And this court recognized that despite that verbosity, despite that jargon in the claims, it boiled down to an abstract idea, right? And this is really a superset of that, if you think about it. This is not just confined to a mobile device. This is any client computer. This is not confined to videos and things like that. This is any interactive content, right? So the scope is breathtakingly, I would submit, broader than what we saw in the Affinity Labs case. Simio is another, I think, key decision, where there you did have an abstract idea articulation that on its face seemed a little bit specific, right? There the abstract idea was using graphics instead of programming to create object-oriented simulations. And the idea there, and the court there said, let's assume that's new. Let's assume it's useful. But we're going to look at whether you provided enough how. And the claims recited things like a data structure, recited things like adding functionality to an instance of an object, an object-oriented programming. These are fairly specific computer things. But ultimately, it wasn't enough. It didn't provide... ...in order to enable the interactivity. What would you say about the argument that by relocating the interactive app to the web browser, I know you have some arguments that it's not actually on the web browser, but going through the web and doing everything hosted on a web platform is what permits you to do that kind of tapping into the processing power of remote computers. And that's the technical advantage. So a couple of thoughts, Your Honor. One, I didn't hear that my friends on the other side were actually making that argument. They seem to resist that question. And I think for good reason. Because number two, the specification doesn't suggest that it's the use of distributive power specific to the web. And here's how we know it. We know it because the specification says you can use any network. You can use anything, internet or otherwise. That's just one example. Well, this claim is defined down to at least the web, right? It is, sure. And in that sense, it's no different than tacking on the web to anything. If that were enough, I think... But I'm trying to figure out whether there's an insight here that didn't exist before. And the insight was, let's go get the processing power of these remote computers. Let's do that through the web. Let's have our app now on the web platform. And now we can do this in a purely web-based way without having to rely on some external helper app fired up at the client computer. Right. So I think we could at two levels. One, we could assume that it was an insight. And I think that's... The problem is that's where they stop. There's one case that the court decided where it said, it's a great idea, but that's where you stop. And he didn't tell us how to do it. But I don't really even think that the specification goes into that level of detail, let alone the claims. Right. That there is some insight in doing it on the web to harness this power. In fact, the inventor, when asked repeatedly, what is it specific about the web, using the web here versus other networks that makes these claims special? And couldn't come up with an example. That's at page A15545. And then goes on two pages later to say, in fact, there are limitless ways you could do it. So I think they're kind of disavowing any notion that there's anything specific here connecting the web to that distributed content. And Your Honor, I have promised you a citation on the separate from, and that is at A6538. Interactive content app is still external. Their expert acknowledged that it's quote, not built into the browser. That's at A18296. So absent further questions, I would submit that the court should put, finally, an end to Eolas' quest to, in its words, own the interactive web as we know it. That's exactly the type of thing that 101 has prohibited for a long time. The Supreme Court has prohibited going back, arguably, to the O'Reilly case, but certainly in modern times. Well, that raises a question that something you said a few moments ago triggered in my mind. You said, I think, that before the rise of 101 jurisprudence in recent years, that this patent would not be vulnerable to being struck down. And I'm wondering whether I misunderstood you or whether you think there would be a different way of striking down the patent under the non-101 directed analysis of cases like Morse and Halburton, which were directed to pure functional claiming. So to clarify, Your Honor, our view would have been then as now that they are ineligible under Section 101, just to be clear. Right, I understand. But are you saying that that's the only basis and were 101 to be struck down retrospectively tomorrow as a basis for kicking out patents, then you would lose this case? No, we think we have very strong invalidity, kind of traditional invalidity defenses. But what I'm trying to go with this is, do you, to cut to the chase, do you think that Morse and Halburton were essentially 101 cases in different clothing? I think the answer is yes, and I think that's backed up by the Supreme Court's view of it. In Mayo, it invoked Morse. In Alice, it invoked Morse as a kind of doctrinal underpinning of this notion that you have to say how. In the Morse decision, the court said, for aught we know, there might be other ways of doing this. Well, that's exactly, I assume, what we have here. For aught we know, for aught they knew, we now have the interactive web that they're seeking to own. Any way of doing it, everything from Gmail to Apple, excuse me, to Amazon cart to Walmart cart to anything. But this doesn't make it ineligible, right? That makes it a broad claim. I'm just letting you know that that's not what's convincing me. I want to look and see whether there's an abstract idea under step one and step two, not that the claim is broad alone or that it covers a lot of different possibilities now. Something written in 1994 or invented in 1994 might cover a lot of different technologies now. The question is whether step one and step two are satisfied as the district court said. Absolutely. And I think the district court was spot on. I think the analysis in that case was similar to the Aftek mobile case that this court considered and affirmed, where there were some seemingly intricate limitations, including pre-coded software components that you allow the user to manipulate and create a mobile application. Again, this would be a superset of that. So not to put every egg in the basket of breath, but I think the court has indicated that that is certainly a consideration in determining whether there's an abstract idea at step one and determining whether nothing invented was added at step two. So absent further questions, I would urge the court to... Do you think the invention of Google Docs is patent eligible in the sense that now we had a document that was being hosted on the web that multiple different parties could work on simultaneously and populate with content, make adjustments. And then the theory would be, well, that was a technical improvement over the old days where different people had to share edited versions of the document through email. And now you don't have to do that anymore because now this is a web-based platform for a community of people to be able to edit the document. Is that patent eligible? I think the devil would certainly be in the details. If it was phrased as broadly as, hey, we have a great idea. Let's allow collaboration on the web kind of the same way we did on hard copy to sit in a room and everybody could pass it around. And I'm gonna dress it up with some limitations while acknowledging that HTML is not new or acknowledging the web is not new. I'm gonna say do it on the web. I would think in that circumstance. Now, if they provided some technologically interesting way of doing it and claimed it, then absolutely it could potentially be. But again, the devil's in the details, which reminds me, I would point the court that there are some unasserted claims in that case, this case, that have some other details not found here. Now, would those make the difference? I don't know. It talks about parsing HTML. It talks about embed types. It talks about data structure and things like that. None of that is found here. So that's at least more detail. I don't think it would get over the section 101 threshold, but that's the kind of thing that you need enough of, I think, to make it patent eligible. The OLA cites the district court's finding with respect to double patenting at page J13643 to support its view that it was not routine and conventional to put interactive content applications in a browser. What is your response to that? I think that actually shows exactly the problem here, because the district court looked at it and said, OK, why does it not fall under obviousness type double patenting? And this is, I'm looking at page A13644 through 47. I think that's where your honor was as well. And the district court said, well, what is it about these claims that's different? Ultimately, it boils down to doing it on the web. And it says there are some limitations and it recites and it says doing on the web by automatically invoking an application, right? But that automatically invoking was present in the prior continuations that were found invalid under 102 and 103 in this court affirm. So the court wasn't saying that that part was new. What part of it was new was the fact that you're doing it on the web. And a couple of times in its decision, it made that point pretty clear, I think. It's doing it on the web. And that's to go back to your honor's question. Even if you look at that side of the abstract idea and put it in step two, it's exactly what this court has held. You can't do and get over step two. Ultramercial was at the pleading stage even. And it wasn't enough to say, do that interactive content on the web, IV versus Capital One. Do that interactive interface. It was termed in the claim an interactive interface that provide tailored information to the user to interact with. And the claim said, and do it on a web page. And this court at step two said, that's not inventive. Mr. Bell, you've been very generous with your time. As have you, your honor. Thank you very much. We would urge the court to affirm. Mr. Campbell, let's give Mr. Campbell six minutes. Thank you. Could you answer the question that Mr. Bell raised about claim construction and how should we understand this claim? I mean, it looks like based on the claim language that the interactive content cannot be embedded in the browser. But according to Mr. Bell, under some Markman order, there's a different understanding. Yes, your honor. Through all of the claim construction, the OSS for a plain meaning and defendants tried to import limitations. But what the district court said is that it was going to be true to the claim language. And what the claim language says, right, is the web browser is configured with interactive content applications. That doesn't mean it needs to be embedded with. It doesn't mean it needs to be part of. It can be a separate, it's separate application that is embedded within the browser application. And we just follow the plain language of the claim here to decide whether they're not the interactive application is, sorry, whether the web browser is configured with the interactive content application. So I guess now I'm trying to understand what is the threat configured with? You're saying like the the web browser could be here, but the interactive app is somewhere 500 miles away. But we can still say that the web browser is configured with that interactive app. No, I think I don't know how 500 miles away it has to be configured with the web. It has to be the web browser is configured with the interactive application. So when you're in the web browser, right, you are using the web browser. Information is detects an object and the web browser is configured with the interactive content application, a plurality of interactive content applications actually required on the claim such that it can then automatically invoke the internet. I'm very confused because the question was, what does configured with mean? And you answered by saying configured with. What does that mean? And I see the district court's construction says specifically that the client computer application is separate from except that it does have this language separate from the interactive content application. Yes, and so configured with means the browser itself can invoke the interactive content, but it doesn't have to be inside or part of the web browser, just that it can invoke it. It can invoke it. And be invoked doesn't go wrong. I guess I'm I'm struggling with this geographical distance. If you were to 500 miles away and say, no, no, no, that wouldn't work. Well, why? Given the answer you just gave to your story. Yeah, I guess I'm struggling with how geographic distance how to consider geographic distance in here. But in your view, that would still be eligible to be configured with so geographical distances don't matter to configuration. Well, no, I don't. I don't think that that certainly doesn't work in the structure of this entire claim. The structure of this claim requires that this distributed application is part on the client and part on the server. So you're going to have to have part of it on the client such that the worldwide web browser is configured with at least that part and can. It's part on the client, but yet it's still somehow separate from the web browser. Yes, not everything has to be enveloped in the same program, the same executable file, the same source code, the same you have multiple applications on your computer, right? So as long as the web browser is configured with those applications and can detect that one of those applications and automatically invoke one of those applications to deal with the interactive object, then it's configured with that application. So I think this highlights a good point that the claim doesn't cover everything interactive. The claim has specific architectural requirements such that you could have a system, you could have an implementation that doesn't cover something that's interactive. For example, the browser maybe doesn't select the interactive content application. The user has to select that. The browser doesn't automatically invoke an interactive content application. The browser doesn't display the object in a web page. It displays it in some other program. You could have many, many ways in which you could have interactivity generally and still not infringe this claim. This claim requires architectural changes to the way the web was before that allows for this interactivity, scalability, and security. And so when we think about... Stop with the scalability and security. OK. OK. You keep using the word architect as a verb. And I just want to understand, you're saying this claim architects, re-architects the web that allows for something, allows for interactivity. Why couldn't you get that interactivity without re-architecting the web? I think you could have interactivity without re-architecting the web. You could have a different network environment with a different program. So then what technical advantages are there at all? So as in the record, as Dr. Martin explains at 12028, doing this on the web in this particular web allows for a number of advantages in allowing the user to have control, in allowing the user to have interactive content over the worldwide web, in allowing there to be... Sorry, your honor said not to mention security, but security is part of it to allow the user to control what interactive content applications are in both. So having this combination of elements, including over the web, enables an interactive system and changes the network in a way that wasn't done before. Okay. Thank you very much for your time. This case is submitted and the court is now adjourned.